KITTEL (ATWOOD v.). See Case No. 641.

---

## Case No. 7,856.

KITTLE et al. v. FROST et al.

[9 Blatchf. 214; 5 Fish. Pat. Cas. 213.] [1]

Circuit Court, S. D. New York. Dec. 15, 1871.

PATENTS—ASSIGNMENT OF INTEREST—ABANDONMENT—"SPRING MATTRESS."

1. The first claim of the re-issued letters patent granted to Samuel P. Kittle October 17th, 1865, for a "spring mattress." (the original patent having been granted to him November 8th, 1864,) namely, "The combination of the two parts. A and A', and an intervening portion of the sides of the box of a box-spring mattress. having the cases containing the stuffing attached to the said sides, the said parts A, A', and the intervening portion, being connected to each other by hinges. the joints of which are located twice the distance apart of the thickness of the stuffing. substantially as herein above set forth." is infringed by a mattress in which the sides of the box are divided into five parts, in such manner that the mattress contains the combination covered by said third claim, introduced twice, once at each end of the mattress.

2. The said patent is valid.

3. K., the inventor, in April, 1863, after making the invention, agreed in writing with F., to assign to F. an undivided one-half interest under the patent when it should be issued, in and to certain specified territory, on condition that F. should perform all of the covenants on his part in the agreement, which were numerous, and concerned principally the making and selling of mattresses. Among them were, however, covenants, that F. should pay "all necessary expenses of procuring a patent" for the invention, advancing the same as it should be required, $30 of it to be advanced before May 30th, 1863, and that F. should "be at the risk of all the expenses arising in the prosecution of the case for a patent" on the invention. In June, 1864, when the application for the patent was ready to be filed, F., at the request of K., paid to K. $15, as the fee to be paid at the patent office on filing the application. It was filed. Subsequently, K. notified F. of his, F.'s. failure to perform many of his covenants, and demanded a compliance with all of them. Two days after the patent was granted, K. notified F. that all his rights under

[1] [Reported by Hon. Samuel Blatchford. District Judge. and by Samuel S. Fisher. Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 9 Blatchf. 214. and the statement is from 5 Fish. Pat. Cas. 213.]

the agreement were forfeited. and that he must not make any mattresses under the patent. The parties then met, and K. renewed the notice, and F., with a view to a settlement of his pecuniary transactions with K., under the agreement, presented to K. a bill, which contained, as a debit against K., the said item of $15, as "advanced on patent:" *Held*, that this was an abandonment by F. to K., with the acquiescence of K., of all rights of F., under the agreement, to an interest in the patent.

[This was a bill by Samuel P. Kittle and Frederick C. Payne against Richard W. Frost, James Black, and George Snyder.]

[Final hearing on pleadings and proofs. Suit brought upon. letters patent [No. 44,960] for an improvement in "spring mattresses," granted to Samuel P. Kittle, November 8, 1864, and reissued October 17, 1865 [No. 2,-092].

[The above engraving illustrates the invention, the bed being shown both as extended and folded. The casing is removed from the section on the right, so as to exhibit the arrangement of the springs.] [2]

S. D. Law and George Gifford, for complainants.

A. J. Todd, for defendants.

BLATCHFORD, District Judge. This suit is founded on re-issued letters patent of the United States, granted to Samuel P. Kittle, one of the plaintiffs, October 17th, 1865, for a "spring mattress," on the surrender of original letters patent granted to him November 8th, 1864. The re-issued patent contains seven claims, but only the first two claims are alleged to have been infringed by the defendants. The subjects of these two several

[2] [From 5 Fish. Pat. Cas. 213.]

claims are defined by the specification in the following language: "The first part of my invention relates to the division of the sides of the box which contains the springs on which the hair mattress or other stuffing is supported, at two points, and connecting the said parts by hinges, in such a manner that the joints thereof shall be, at two points, distant from each other twice the thickness of the stuffing, and so arranged that the head or foot portion of the bed can be folded over so as to bring the principal parts of the box parallel with each other, the stuffing being between them, as hereinafter more fully set forth. The second part of my invention relates to so constructing that portion of the box which forms the short section between the hinges or joints, as to make it capable of supporting a portion of the springs, while at the same time it is of such length as to allow the parts upon each side of it to be hinged to it, and connected to each other at two points on each side, at the distance apart of twice the thickness of the stuffing, as hereinafter more fully set forth." The first and second claims of the patent are as follows: "First. The combination of the two parts. A and 'A', and an intervening portion of the sides of the box of a box-spring mattress, having the cases containing the stuffing attached to the said sides, the said parts, A, A', and the intervening portion, being connected to each other by hinges, the joints of which are located twice the distance apart of the thickness of the stuffing, substantially as herein above set forth. Second. The combination of the two parts, A, A', hinged at two points the distance apart of twice the thickness of the stuffing, the intervening part, A", and a series of springs supported upon slats, attached to the said intervening portion, A", the whole being constructed and operating substantially as herein above set forth."

The object of the improvement covered by the first claim is to enable a box-spring mattress to be folded flatwise without material injury to the stuffing, which is mounted upon and connected with the box bottom containing the springs. The improvement consists in combining two parts of the sides of the box of the mattress with an intervening portion of such sides, by connecting them together by means of hinges, the joints of which are located twice the distance apart of the thickness of the stuffing, the cases containing the stuffing being attached as well to such two parts as to such intervening portion. The specification describes a division of the sides of the box at two points on each side.

The object of the improvement covered by the second claim is to make such intervening portion capable of supporting a portion of the springs, while, at the same time, it is of such length as to allow the parts upon each side of it to be hinged to it, and connected to each other at two points, on each side of the box, at the distance apart of twice the thickness of the stuffing. The improvement consists in

combining such two parts of the box, hinged at two points the distance apart of twice the thickness of the stuffing, with such intervening part, and with a series of springs supported upon slats attached to such intervening part. This construction enables the parts of the box on each side of the intervening part to be folded over so as to become parallel with each other, the spring-box and the mattress mounted on the springs being folded over by the same movement.

There can be no doubt that the defendants have infringed both of these claims. Their mattresses are of a like construction in principle to the mattress of Kittle, differing only formally in this, that the defendants' box has each of its sides divided into five parts instead of three, each of the sides being divided at four points instead of two. The result is, that the defendants' mattress has, in the middle of each side of the box, a long portion, on each side of such long portion, a very short part, corresponding with the intervening part in Kittle's mattress, and, at each end of the length of each side, another part. These end parts can be folded over so as to become parallel with the middle part of the box, and to be in the same plane with each other. When so folded, the defendants' mattress is, in effect, two of Kittle's mattresses combined into one. It embodies each one of the two improvements of Kittle covered by his first and second claims, and embodies each one twice, each of the improvements being applied at each end of the mattress. If cut into two, through the space between the end parts when folded, and through the centre of the middle one of the five parts, two of Kittle's mattresses would be produced. There are the two outer parts, the intervening part, the box, the box spring mattress, the cases containing the stuffing attached to the three parts, the three parts connected to each other by hinges, the joints of the hinges located twice the distance apart of the thickness of the stuffing, and the series of springs supported upon slats attached to the intervening part, and all this in duplicate in each mattress, one of such arrangements at each end. The same result is attained by the arrangements, and in the same way, as in the patent. In such mattresses of the defendants as contain the arrangements above mentioned, except in not having the cases containing the stuffing attached to the parts forming the sides of the box, the second claim of Kittle's patent is infringed. It may be that the defendants' mattresses contain a useful improvement beyond what is found in Kittle's patent. Whether they do or not is of no consequence here. They certainly embody what is patented by Kittle.

In addition to the defence of non-infringement, urged at the hearing, but not set up in the answer, the allegation of infringement made in the bill not being denied by the answer, the defendants attack the patent for want of novelty, various specifications in that regard being contained in the answer. Without going into a detailed discussion of the prior inventions set up, it is sufficient to say, that none of them embody what is covered by either the first or the second claim of the Kittle patent. The three principally relied upon are what are known as the "Putnam bed," the "Colton folding bedstead and mattress," and the "Cincinnati bed." These are effectually disposed of by the testimony of the expert on the part of the plaintiffs, and there is no testimony in contradiction.

The defence really relied on, and which has caused the proofs in this case to be swollen to the bulk of some seven hundred printed pages, is a claim, on the part of the defendants, that what they have done in respect of their mattresses has been done under a right or license granted by Kittle under the inventions covered by the patent. The answer sets up, that, by a written instrument executed by Kittle and one Alexander D. Farrell, on the 11th of April, 1863, Farrell became interested in Kittle's invention, and in and to the patent subsequently issued for it, to the extent of one undivided half interest in and to all the counties in the state of New York, except those lying on, or west of, the Genesee river; that Farrell duly complied with all the conditions contained in said instrument requisite or necessary for the proper vesting of said interest in Farrell; that the defendants are selling folding-bed bottoms, and all of them are made by Farrell; and that, if they contain any thing covered by Kittle's patent, they have been made and sold to the defendants under such license to Farrell, and Farrell has, by virtue of the interest referred to, such rights under Kittle's patent, that the defendants are justified in selling such bed bottoms, without thereby infringing Kittle's rights.

The instrument referred to bears date the 1st of January, 1863, but was signed the 11th of April, 1863. It recites, that Kittle obtained a patent for a "rollable spring mattress," August 28th, 1860; that he has recently invented a "folding-box spring mattress," for which he is about to apply for a patent; and that Farrell is desirous of manufacturing the said mattresses in the city of New York, and of acquiring an interest in the last-named invention in the state of New York, when the same shall be patented. Then Kittle, "in consideration of the covenants and agreements" by Farrell, thereinafter contained, "and of and during the true and faithful performance of each and every of them," grants permission to Farrell "to manufacture and sell the said rollable and folding spring mattresses in his factory in New York City, for the term of two years" from the date of the instrument, and agrees to pay Farrell "four dollars per month for the privilege of selling the said mattresses from

samples of the different grades" described in the instrument, (which Farrell is to expose for such purpose in his salesroom,) and also for the attention of Farrell to making sales, taking orders, delivering goods, and collecting bills, during the absence of Kittle. Then Kittle "agrees further to assign an undivided one half interest in and to all the counties in the state of New York, (except those lying on, or west of, the Genesee river,) for and to the right in the folding mattress, when the patent for the same shall be granted by the United States" to Kittle; and Kittle further agrees to pay to Farrell the price thereinafter specified, as regards the grades and the time of payment; and Farrell, "in consideration of said license or permission and agreements, covenants and agrees, on his part: (1) "To proceed without delay to manufacture the above mattresses according to the patent improvements, plans and directions" of Kittle, thereinafter specified. (2) "To expose the several grades of mattresses" thereinafter specified, "for the inspection of the public, in a convenient store or show room, where he is to advertise the same by personal effort, by cards, circulars, and through the newspapers, always representing the rollable mattress as the most economical and best mattress or bed that can be procured." (3) To furnish Kittle "office and desk room in his store or show room, above specified, and, for the monthly payment of four dollars, to allow the customers" of Kittle "to examine the different grades of beds at all regular business hours, and, in the absence" of Kittle, "to attend to them as he would to his own customers, take their orders, and supply them promptly with any mattresses they may order, and make out and collect the bills, and keep an accurate account of the same" for Kittle. (4) "To keep an order book, in which every order, as soon as received, shall be legibly entered, and the actual number of each mattress, as soon as finished, shall be regularly entered, and, when sold to whom and where sold, and see that a corresponding number be entered on the label or patent mark which shall be permanently affixed to each mattress when finished." (5) To pay Kittle "one dollar each for every rollable spring mattress he shall manufacture on his own account and not" for Kittle "or his customers, (every person who shall inquire" for Kittle, "or who may have previously negotiated for or bought mattresses of him,) and to pay all necessary expenses of procuring a patent for the folding spring mattress, advancing the same as it shall be required in the progress of the case, thirty dollars of which is to be advanced before the thirtieth of May, 1863." (6) "To promptly supply all the orders of Kittle" and his customers, at actual cost of the material and labor, and twelve per cent. profit, and three per cent. national tax added, thereto, cartage and packing or boxing (if such there be) to be done at actual cost" for Kittle.

"If the delivery is direct from the cart or store to the customer, payment is to be made within three days after delivery, but, if out of town, or by second conveyance, then in ten days." (7) To allow Kittle, "or his known agent, free access to the aforesaid order book and all its entries, as well as unobstructed access to all parts of the manufactory at all regular business hours." (8) "To make a full, accurate and minute statement every week of all the mattresses manufactured during the week then ending, their kind and the actual number of each, to whom and where sold and delivered, such statement, together with all moneys due or belonging" to Kittle, and in the possession of Farrell, to be delivered to Kittle, and, in case he is out of town, to his wife, at his residence." (9) "To make all mattresses strictly in pursuance" of a schedule thereinafter contained, "unless it shall be clearly impossible to retain custom or make the sale without deviation, and then to deviate no further in degree or number than is absolutely necessary for such case, and no such deviation is to be made a rule in any case or to any customer, except in case of special written directions by letter, which shall fully state the deviation and its extent, and to whom it applies," from Kittle. (10) The schedule referred to, covering rollable mattresses, and folding spring mattresses, of various grades and sizes. (11) "To see to have the work done by the piece and as advantageously as possible, and, if it is found that the cost therein can be reduced," Kittle "is to have the full benefit thereof on all made for him or his customers." (12) "In case the cash value of the material entering into the above mattresses shall rise or fall in the market, wholesale cash price, then such addition or reduction shall, in all cases, be made in making up the price" to Kittle, "for his and his customers' orders, before adding the provided per cent." to Farrell. Lastly. "Not to sell any of the above grades of mattresses at lower prices" than Kittle "shall be in the habit of selling, nor to charge exorbitantly high prices for the rollable mattress above specified, but, in general, to conform, as near as possible, to the established or general prices" of Kittle "and to seek uniformity of prices in the sale and introduction of said mattresses." Finally. Farrell "is to be at the risk of all the expenses arising in the prosecution of the case for a patent on the folding spring mattresses aforesaid," and Kittle "is to use all diligence to hasten the issue of the same."

The defence set up under this agreement is not claimed under the provision thereof whereby Kittle, for the consideration specified, grants permission to Farrell to manufacture and sell the folding spring mattresses for the term of two years from the date of the agreement. That term expired before the 17th of October, 1865, the date of the reissued patent. The defence alleged is, that Farrell

became, under the agreement, entitled to an undivided one-half interest in the patent for the folding mattress. for the territory in that respect specified in the agreement, which embraces the territory within which the infringement by the defendants is alleged by the bill to have taken place.

A voluminous mass of testimony has been taken on both sides, in regard to points of compliance and non-compliance by Farrell with the covenants and agreements specified in the contract, as to be each of them truly and faithfully performed by him. as the consideration of the agreement by Kittle to assign to him the specified interest in the invention and patent. But I shall not examine these in detail, as there is one view of the case which seems to me controlling in favor of the plaintiffs and against Farrell. The defendants have no greater rights than Farrell has. They justify under and through him. Consequently, if Farrell deliberately abandoned his rights under the agreement, so far, at least, as a claim to an interest in the folding mattress patent was concerned. and made that abandonment directly to Kittle. with the acquiescence of Kittle, the defendants are without justification.

It was one of the stipulations on the part of Farrell, in the agreement, that he would pay all necessary expenses of procuring a patent for the folding spring mattress, advancing the same as it should be required in the progress of the case, and, again, that he would be at the risk of all the expenses arising in the prosecution of the case for a patent on such mattress. The application for the patent appears to have been in readiness to be sent to the patent office on the 9th of June, 1864. On that day, Kittle applied to Farrell to furnish him with the sum of $15, as the fee to be paid at the patent office on filing the application. That amount was paid by Farrell to Kittle. for such purpose, on the 10th of June, and the application was filed. On the 22d of August. Kittle wrote to Farrell a letter complaining that Farrell neglected to perform any of his obligations set forth in the contract. and specifying some particulars. On the 27th of September. Kittle wrote to Farrell another letter. saying that he had not received for many weeks any of the benefits contemplated in the contract, that he had called upon Farrell frequently to perform his obligations as specified in the contract, that he had written to him in August calling his attention to his overcharges and other violations of the contract. and that Farrell had since then repeatedly refused him his rights and privileges under the contract, and demanding of him immediate payment of a bill therewith presented, and an immediate statement in writing of all rollable and folding spring mattresses included in the contract, and manufactured by Farrell since the last bill rendered to Kittle, and the payment of all moneys in Farrell's hands belonging to Kittle, which Farrell had collected on beds sold or delivered to customers of Kittle's, and access to the order books, for examination; and, as he alleged he had been refused access to the shop or manufactory, the removal of all restrictions to free access thereto, and a full, faithful, and immediate compliance on the part of Farrell with all provisions of the contract. The bill accompanying the letter contained various items of charges against Farrell, and, among others, one of $15 for the first patent fee, under date of June 11th, and a credit, under date of June 10th, of $15, as furnished by Farrell on Kittle's order. leaving the amount of the bill at $180.31. The letters and the bill were presented to Farrell. The patent was granted on the 8th of November, 1864. On the 10th of November, the attorney for Kittle sent a letter to Farrell, advising him of the issuing of the patent, and notifying him that all privileges claimed by him under the agreement were forfeited by reason of the violation by him of the provisions of the agreement, and that he must not manufacture or sell any mattresses involving any invention for which Kittle held a patent, and demanding an immediate adjustment of the claim of Kittle for the previous use of his inventions. On the 2d of December, the attorney for Kittle wrote again to Farrell, requesting him to call upon the attorney in regard to the unsettled matters between him and Kittle. In pursuance of this request, Farrell had an interview with Kittle and the attorney, at which Kittle informed Farrell that he had forfeited his rights under the contract, by a failure to perform the contract on his part, and that he was infringing the folding box spring mattress patent, and must. cease to manufacture folding box spring mattresses. At the same interview, Farrell produced and presented to Kittle, as a bill of the amount due by Kittle to Farrell at the time, a statement of items of debits and credits, in which statement there is charged by Farrell against Kittle, as an item of debit, $15, as "advanced on patent." The amount claimed by Farrell, after deducting the items of credit to Kittle. was $125.01. This item of $15 was the sum of $15 advanced by Farrell in June, 1864, for the fee on the patent. It is quite apparent, from what transpired between the parties. that both of them. in December. 1864, regarded the unsettled matters between them as consisting solely of their pecuniary transactions. under the contract, and considered the contract at an end so far as any further action under it was concerned, except by way of remedy for the past, and understood that Farrell had acquired no right to any interest under the folding box spring mattress patent to Kittle. The charging in account, by Farrell to Kittle, of the $15. which he had previously advanced to Kittle towards the patent fee on the patent, and which sum it was for Farrell to pay absolutely, and not charge to Kittle, if Farrell was to acquire any interest under the patent. and the doing this after he knew that the patent had been issued, and

after he had been informed by Kittle that he had forfeited all his rights under the agreement by having violated its provisions, and was infringing the patent, and must desist from its infringement, must be regarded as an acquiescence by him in the position taken by Kittle, and an abandonment of his claim to an interest in the patent, leaving him to his right of action against Kittle for any amount due to him on transactions under the agreement. Farrell had, in fact, as the evidence shows, failed, in many particulars, to perform his stipulations in the agreement, so as to entitle himself to the interest in the patent. He was conscious of this, and hence this clear act of acquiescence in the views of Kittle, and this waiver of a claim to such interest. In the mass of testimony given by Farrell, covering one hundred and eighty printed pages, and eight hundred and seventy-six questions and answers, no explanation is attempted to be made by him as to what he intended by making this charge against Kittle, other than a waiver of his claim to an interest in the patent, nor was any satisfactory view on the subject, founded on the evidence, suggested by the counsel for the defendants on the hearing. Indeed, the proof shows, that, from a period as early, at least, as the date of the patent, the parties, by their mutual acts, regarded the agreement as at an end, at least so far as it could operate to vest in Farrell an interest in the patent.

There must be a decree for the plaintiffs for a perpetual injunction and an account of profits, with costs.

[A demurrer to a bill for infringement of the same patent was overruled in 30 Fed. 689.]